Good morning, ladies and gentlemen. We are here this morning and we also have with us on the screen Judge Rovner, who will be participating in this panel. I would ask that you take a second and make sure that our video and audio transmissions are responding in case she has a question. But with that in mind, we will turn to our first case for this morning and Mr. Schoen, Lipsey v. United States. Good morning. I represent the plaintiff, Epelinda, in this case and the Epelinda in interest actually is a disabled minor who was a viable When this detainee was taken into custody, it was September 11, 2009, she was late in the last trimester of a high-risk pregnancy with this baby. The United States Marshal Service had the duty under its own mandatory directives and prisoner health care standards to take action to ensure that she received reasonable and medically necessary care and in the context of her condition, that would mean that equates to prenatal care and obstetrical care. But let me ask this, I mean we sort of have two moments. At the time of the transfer request, there was a facility available that had obstetricians available on staff. Excuse me. We need to get the volume turned up, Judge Rovner. Oh, sorry. Please start your question and we'll see if it's enough. Thank you. So sorry. Did you present evidence that at the time of the transfer request, there was a facility available that had obstetricians available on staff to which Ms. White could have been transferred? No, Your Honor. It is not our position that the United States Marshal Service was negligent for not having an OB on staff at the facility she was being housed at. It is our position that they transferred this detainee to a facility where she would go into labor and deliver and would absolutely need an obstetrician. And they did this without first confirming that there would be an obstetrician available in the community who was not only available but was willing to provide her with obstetrical care. And it turned out there was no such obstetrician. Well, I had a similar question. There are two moments with respect to the Marshal Service. There's the moment when she's first transferred to the Jerome Coombs Detention Center and then there's the moment later on when the request is made to move her from that center. So I want to focus on the first one. As I understand the record, the marshals, Mr. Goble or whoever it was, surveyed the available places and concluded that the Jerome Coombs Center had the best medical facilities available and that indeed had a track record of working with community obstetricians in the local hospital. So it's hard for me to see how he's making a mistake, or at least how he's not in some way exercising his discretion in a way that would put you under the Discretionary Acts exception. It's our position that this particular detainee had needs that arose out of the fact that she was late. She was going to have immediate needs for an obstetrician. She was late in the gestation of her pregnancy. She was a high-risk pregnant. But did he know she was high-risk? Yes. They were aware that the marshal, well, there was sufficient information for them to be aware that she had nine prior pregnancies. She's what they call a grand multipara, that is a risk factor for the delivery. She was of advanced maternal age. Ultimately, when she was transferred and they took her blood pressure, she had systolic blood pressure that was almost off the charts, which is a risk for the baby. But he didn't know that. I mean, the 161 over 86 is a measurement taken at the Jerome Coombs Center, not in Hammond. It's taken on the first day of her custody. But why is that the marshal instead of the Kankakee County people? Because the transfer of this detainee to the Coombs Center does not relieve them of the responsibility of continuing to verify that she is receiving reasonable and medically necessary care. And to do that, you have to know something about what her condition is. They have the obligation under a mandatory standard called 9.2 that even after the transfer, the detainee... 9.2 of what? It's the U.S. Marshal Service Directive 9.2. The Federal Tort Claims Act creates liability, makes the federal government liable to the extent provided by state law. So is there any state law obligation on the Marshal Service to monitor a prisoner after transfer? There is under Illinois common law, there would be the responsibility to do that. I know that Section 4105 of the Illinois Tort Immunity Act allows liability only if the employee knows from his or her observation of conditions that the prisoner is in need of immediate medical care and through, and you have to have the and, and through willful and wanton conduct fails to take reasonable action to summon medical care. What observable condition requiring immediate medical care was either ignored or not reasonably addressed? But, but, and if, please focus separately on the Marshal Service, at least for me and the Kankakee County... Yeah. Okay. People. So they had no data that we would call observable data. What they had is they had someone that they knew was late in the gestational period and was going to have an immediate need for obstetrical services and then they transferred her. And they knew where they transferred her to would have to be able to provide obstetrical care for her. It was going to be essential. But what's wrong with having somebody at a place like the detention center and the labor and you put her in an ambulance and sent her off to the hospital, which is what they did. In this case, going, she has a prior history of going into labor and having a placental abruption. Her last pregnancy, that's what happened to her. I understand that, but we have another aspect of this case about the records and who knew what about that history when. It's one thing to know that she's multigravid. It's quite another thing to know that she'd had a placental problem before. Well, I can tell you that the marshal service is not wandering around in the darkness. They were specifically given notice, and I'm addressing the second date, of course. They were specifically given notice that, I mean, they were aware she needed obstetrical care. They were given notice that no obstetrician had seen her. This is the 17th of September we've moved up to. Yes, it is. Not the 16th. I apologize. They were given notice that no OB had seen her. She had received no OB care. They were told by the county that she urgently needs to be transferred out of this facility in order to receive care that's necessary to her pregnancy. If you want to know what their responsibility is under those circumstances, the deposition of the national medical director of the USMS was taken. He said if the county can't get her care, if they can't find care for her, then the United States Marshal Service has an obligation on its own to go out and find appropriate care for her, and they did nothing. What they did is they refused her transfer, and they took no action to get her care. By refusing her transfer, they relegated this plaintiff, who was a high-risk pregnancy to begin with, to continued custody in a facility. They had no care for her, and that's the way it turned out. She got no care while she was in prenatal custody there, and by relegating her to custody in a place where there's no care, that amounts to a denial of care. Let me explain where I have a bit of a problem. She presented with a pregnancy that, by her own admission, had been uneventful. The high blood pressure was the only observable symptom of a problem, and I didn't see that there was anyone who argued that the high blood pressure required an immediate transfer to a hospital. And once the immediate... When she experienced labor pains, the emergency responders were summoned immediately. And prior to that time, appointments were held with local staff to monitor her condition, although she did refuse to go to one of those appointments. And an appointment was made with an obstetrician. I'm not quite certain that I'm getting what people are wanting here. And that's it. Those comments relate to the Kankakee County people. What were they doing that would not fall under the umbrella of the Illinois Tort Immunity Act? Well, first of all, by taking custody of this detainee at a time when she was going to need prenatal care for delivery of her pregnancy, that detainee became completely dependent, as did the child she was carrying, on their providing care. Their taking custody of her constitutes an undertaking of the prenatal care of this pregnancy. I mean, she couldn't go out of the facility and get care on her own. She had to rely upon, and did rely upon, the county to provide it, and that constitutes an undertaking. And under the, I think it's 6106 parents C and D, if I got those statutes right, when you undertake the management, monitoring, care, or treatment of a condition, and you do so incorrectly, or you do so not at all, you are liable, if you're a government entity, you are liable for damages approximately caused by your negligent conduct. And here they were. I mean, they were, you know, looking at the county. They had an obligation to. But you don't have much to hang your hat on, although I am going to be asking the county the same question the other way. Because on the one hand, Ms. White is repeatedly saying, as Judge Rovner pointed out, that she's fine, she doesn't need anything, she's refusing on one occasion even to be seen by the physician's assistant, even though he wasn't an obstetrical specialist, there's a certain amount of basic information he could have collected. So that's all bad for you. On the other hand, we have the blood pressure on intake at 161 over 86, and we have the September 16 reported labor pains, about which nothing is done. So we have to understand how you can get from those facts to liability. A lot of it, they had an obligation, the county had an obligation to get her prenatal records. The prenatal records were a forecast of the placental complications that she was at risk for. Right. And so your position is that there's at least a disputed issue of fact about whether they tried to get those records since Dr. Taylor got them so quickly. Yes. Okay. And so it was a forecast not only of the complications that she was getting placentally, it was a forecast of the type of delivery she was going to need, she was going to need an emergency C-section, and a forecast of how early she would deliver. But they didn't get these records. As far as refusal of care, there are credibility problems with the testimony of that witness that are massive. He says that person says he went up to her, had a personal visit with her, and recommended that she attend sick call and he would perform an obstetrical examination on her. He is not an obstetrician, but that's what he recommended she do. He said he did it in a personal meeting. No record exists. There's no record. No, I mean, I understand the theory here. If it's not in the chart, it didn't happen, basically, which is the way the medical profession works. And as far as her being in fine condition, the problem that she had here, she had this history of a placental abruption. Those don't become symptomatic until it's, I mean, once you get a placental abruption, you cut off the supply of oxygenated blood. The child has 14 to 16 minutes before brain damage starts to occur. So did you have an expert that related the high blood pressure to the risk of placental abruption? Yes, yes. The maternal fetal medicine expert, Dr. Gonzalez,  So you do have some evidence in the record that a properly trained person would have seen that blood pressure on September 11th and recognized it as a risk factor. Yes. And, you know, going back to the U.S. Marshals Service, when they were told she's not getting essential care, and when they refused the transfer of her so that she would get it, they relegated her to stay in a place where she was receiving no care. That amounts to, I think, a denial of care. And the person who was in charge of enforcing their standards didn't even know the standards existed. He was not able to ensure that she received care guaranteed by the standards because he had no idea the standards existed. He had no idea what their contents were. He didn't even know what the responsibilities in terms of health care were that the USMS had to this person. And, you know, as far as discretion, it's his responsibility, his job responsibility, as someone whose job it is to enforce these standards, to be aware of the standards he's supposed to enforce. There's no discretionary decision about, gee, should I or should I not read this, which I am required to enforce in order to protect the health of patients. I see my white light is on. All right. That would be fine. Thank you, Your Honor. So we're going to have Mr. Haveman first. Good morning. Good morning. May it please the Court. I'm Will Haveman for the United States. I'm joined at council table by David Hoff and Peter Paoli, who represented the United States in the district court proceedings. I'd like to emphasize first that the council for Mr. Lipsy recognized that there was no facility with an obstetrician on staff where Ms. White could be sent on September 11th. Would there be any need? No evidence. What you're saying is that there's no evidence whatsoever in this record that a facility was available with on-site obstetricians at the time she was placed. That's right, Judge Rovner. There's no evidence in this record suggesting that an obstetrician was available on-site. The record evidence to that point is from Deputy Marshall Goble, and he noted that there were four options of facilities that he was considering, and he chose the JCDC, as Chief Judge Wood noted, because he believed that it provided the best care. It had two doctors. It had two nurses. It had a physician's assistant, and it had what the district court referred to as a relationship with an OB on an as-needed basis. So at the time he makes this recommendation, and makes the decision actually to send her to JCDC or the Combs Center or whatever, I prefer to call it that, he, you're saying, did know that in the past they had been able to use community obstetricians successfully. That's right. Even though it turns out not to work quite as well this time. But ex-ante, he thinks that that relationship is there. Ex-ante, he believed that that relationship was there, and he had no reason to believe, nor did the JCDC have any reason to believe that it wouldn't be there in this case. So how does that help the September 17th point in time? Obviously, the placental abruption doesn't occur until the morning of delivery, because the fetus would have been dead if it had already happened. When the staff actually tells him, we can't do this. Well, so I do want to, I think, correct and correct the record on this point. I want to emphasize what was actually communicated to the marshal service, or what was alleged to be communicated to the marshal service in that phone call from Chief Downey. And it's reproduced in the district court opinion. And what Chief Downey said was that I contacted Indiana, that's the marshal service, because of the issue of not being able to find an OB doctor, this original Dr. Hale, and just indicated that we can't find an OB doctor, but we would keep trying. However, if they could take her back, you know, we would just as soon send her back to Indiana and let them find an adequate place for her. So it is not correct. It is not a correct representation of the record that they indicated to her that there was an urgent need for a transfer, that she could not receive care. What was communicated, or at least what, on this record, the court has to take as communicated, was that they said that they were having difficulty finding an OB doctor, but that they would keep trying, and that is precisely what they did. And so the question for this court is whether or not there was a mandatory obligation on September 17th to transfer her to some different facility. That didn't have the same degree of medical care as the JCDC offered, that would require a break in the continuity of care. There was no care. What was the continuity of care to break? Well, she had seen both nurses. And they do nothing. She had done intake. They take her blood pressure, and we have evidence in the record that this blood pressure was an immediate indicator that she should probably have been taken off to the hospital right then. Again, on this record, there's no suggestion that was communicated to the Marshal Service. But even if it were, that would not give rise to a mandatory obligation to transfer Ms. White to a totally different facility, which also would face potentially the same problem. That is, that facility would not have an on-site obstetrician, and so that facility would be in the position of having to find off-site care in the same manner as the JCDC. So where does the standard of care enter into this? Excuse me. Pardon me. I'm sorry. What about transferring her to a hospital? That's an excellent point, Judge Rovner. And what everyone recognized, what the Marshal Service recognized, what is represented in the contract between the Marshal Service and the county facility, and what the chief of that facility also recognized was that if there was an emergency need for care, if they determined, if the county determined that she was not receiving adequate care, they could always send her to a hospital. But that was an obligation of the county and not of the Marshal Service. And the contract between the county and the Marshal Service spells this out. It says that upon transfer that the county can always decline to accept a federal detainee. But once it accepts a federal detainee, medical care for federal detainees shall be provided by the local government. That's page 6 of the statute. What concerns me is that the moment of September 17th, when the Marshal Service, for an eight-and-a-half-month pregnant woman, standard of care would suggest that she needs to be seen by an obstetrician at least once a week. And so we know that more than a week has gone by. She hasn't been seen by anybody. It seems that the Marshal Service easily could have said, even though you can't transfer her here, we are authorizing you, even though it may not seem like an emergency, to take her to the hospital. There's going to be an obstetrical resident at least at the hospital. But they don't do that. They don't take a step which would have been well within their ability to take. Upon notice. I guess I have two responses, Chief Judge Wood. The first is that there's no dispute that the county could have taken that step had it believed that that step was warranted. That is, everyone understood that had an urgent need for care actually arisen, that the county had the authority without providing notice to the Marshal Service to send her to a hospital. And the second thing that I would note is that even if the court believes that that would have been the appropriate thing to do, even if the court thinks that that would have been a reasonable thing for the Marshal Service to do, that simply does not give rise to an optionless course of conduct that someone in Deputy Marshal Goebel's position had to take. And that is the standard under the discretionary function test. So I don't quite understand that. So in your view, Deputy Marshal Goebel had no duty to take steps to ensure that she was getting obstetrical care. I don't think that that's quite right. But I think that the Marshal Service does have a duty to ensure medically adequate care, and the Marshal Service fulfills that duty by contracting with local facilities, who then assume the responsibility for providing the care to detainees. Okay, so nothing interrupts that cause. Even if the local facility gets back in touch with the Marshal Service and says, We can't do it. Everybody quit. We had to shut down. Hurricane Jose hit us, or whatever. Once you've sent them there, that's it. So I will answer your question. I do want to emphasize that that's not the record that we have here. That's not what was communicated. Okay. I understand. We're a long way from Hurricane Jose. Even if that were, the proper course of conduct, as everyone recognized, was that they could always send her to a hospital. They could always send her to an emergency room. And I think even counsel for Mr. Lipsy recognizes in his argument with respect to the county that what they should have done was they should have sent her to an emergency room earlier. And I don't think that that argument can be reconciled with the argument that the Marshal Service had a mandatory obligation under its own standards to transfer her to a different facility that may well have faced the same issues as the JCDC. If there are no further questions, thank you very much. Judge Rogler, anything? No, thank you. But thank you. All right. Mr. Condon. Good morning. My name is Michael Condon, and I represent the Kankakee County defendants in this case. And as the district court correctly noted, there's no evidence in this case of any willful and wanton conduct on the part of the Kankakee County defendants. Chief Justice Wood, in terms of the record, I would like to clear up a statement that plaintiff's counsel said that Mr. Menard did not document that he had attempted to see Winona White on September 18th. He did fill out a log note on that date and testified in his deposition that she refused health care, and he explained the risk to her of refusing that health care. Winona White herself admits that she refused health care on that date and that she signed a written treatment refusal form. So it is undisputed in the record that Ms. White was offered care. When did he fill out that log note? He filled it out on the 18th. He filled it out, and then he testified at his deposition. He filled it out and explained to her what the risks were. And Winona White, who had an opportunity, you know, we have to go back seven years in this case and look at what was happening. And what was happening was we have a woman who was on the LAM for three months and got no OB care. When she did get OB care at Providence Hospital before that, the care showed, I mean the treatment showed that there was no abnormalities with her pregnancy. Well, but let me back up. There are three things about this record vis-à-vis the county defendants that concern me, and I'm aware that we're in this immediately observable, willful, wanton legal construct. One of them is at the intake, the blood pressure of 161 to 86, coupled with the expert testimony that that is an immediate red flag for a woman that far along in her pregnancy. The second thing that bothers me is at September 16th, especially in the light of this blood pressure knowledge, they do nothing when she reports labor pains. They just assume, oh, this must be false labor. There's no indication that they follow up, and that seems to me a moment when they probably should have taken her to the hospital and seen what was going on. Thirdly, there's a dispute of fact about whether Nurse Sangster actually did attempt to obtain the medical records from Providence Hospital. She's given, according to her, the story that they didn't have records for a patient by that name, but on September 22nd, Dr. Taylor, who asks for the same records, gets them promptly. So it seems to me there's a dispute of fact about whether they made any effort to obtain records. So those are the aspects of this that worry me the most. And if I can respond to that, going in backward order, Your Honor. First of all, there is no disputed fact that Nurse Sangster testified, and there's no testimony contrary to that. But why do we have to believe her when we find from Dr. Taylor that actually the records were right there, ready to be sent? I'm sure she says she did it, but that doesn't mean she did it. Well, I mean, she testified under oath that she did it, and there's no testimony. Well, I understand. We have other testimony that suggests if she had done it, they would have come right away. Well, I think it's speculative to say that it would have come right away. But it did for Dr. Taylor. It did for Dr. Taylor. The second thing is I think that it's not in the record. Your Honor said that we did nothing on the 16th. Actually, Winona White was brought to the medical clinic on the 16th, and Nurse Gill saw her. And similar to when Nurse Sangster went to the housing unit on the 12th and talked to her, Winona White testified that she told that there was no complaints. She had no complaints in her pregnancy. And Winona White has admitted that she never reported to anyone at the Jerome Combs Detention Center that she was having any problems with her pregnancy. But the problem with that is that there's a logbook entry that says she reported labor pains. And so, again, look, I'm not going to give her an award for Citizen of the Year, but it's a fact that there's a logbook entry that she's having these pains. We're here on summary judgment. If she was having pains and if the logbook accurately reported, which you just told me for the other entry, you want us to believe the logbook, so fine, let's believe the logbook. Then we have a problem of willful indifference to something that's right in front of you. But, Your Honor, there is a log note from September 16th from Nurse Gill saying that she saw Winona White and that Winona White said she was having no problems with her pregnancy and specifically denied that she had any labor pains. But what do you do with the logbook entry saying that she reported labor pains and Nurse Sangster responds to that report? She reported labor pains in the morning. Nurse Gill saw her that afternoon. And in the record, you'll see from her log note, she sees her in the afternoon and asks her the same questions. Are you having any problems? Are there issues with your pregnancy? No, there's not. Winona White admits that. She says, I didn't have any issues with my pregnancy. She said, I never told anyone that I was in labor. But the logbook entry remains. If Nurse Sangster had sent her off to the hospital upon the report of the labor pains, we wouldn't be here. Your Honor, I think that as the experts have testified in this case, often women complain that they're having what can be false labor pains, contractions. That's why she was brought to the medical clinic. And the nurse asked her all these questions. And she denied she was having any labor pains. And then on the 18th, Physician's Assistant Menard tries to see her. And she refuses treatment. He testified he would have taken her blood pressure. So we have a form for this in your favor. She signs a form refusing. She signs a written refusal form and admits that she refused treatment. And Mr. Menard said he would have checked her abdomen. He would have asked her questions about her prior pregnancy. So we couldn't get the records from Provident. But Mr. Menard testified, as did the nurses, he would have asked questions of her. Did you have any issues with your nine other pregnancies? She refused to be treated. So there is no evidence in this record of willful and wanton conduct. On top of that, they also made repeated efforts to get her seen by an obstetrician. And, in fact, an appointment was made for her on September 29th. No one knew that she was going to deliver her baby before then. No, I realize. Although to go from September 10th to the 29th at her stage of pregnancy with no encounter with an obstetrician, again, strikes me as well beyond the standard of care for obstetrical treatment. It's a once-a-week schedule at that point. Your Honor, I would also ask that you review Dr. Keller's testimony and Dr. Taylor, who was the delivering physician. Both of them testified that there was no need for Winona White to be hospitalized before. No, just seeing, though, if the only obstetrician in Kankakee is in the hospital, I guess that's where you have to see them. Well, no, there was another obstetrician, and then they made an appointment with the other obstetrician. Well beyond the zone. Yeah, but it was three weeks out, and so she's in our facility, and we're doing all these things to try to get her treatment, to get her to an obstetrician, trying to examine her, trying to ask her questions about her pregnancy. And meanwhile, we can't look at this in a vacuum. Winona White herself is on the lam for three months. She had not gotten any OB treatment since June. Well, I mean, that doesn't excuse Kankakee County. No, I'm not suggesting a cause, Your Honor. I mean, she's, as I said, I'm not nominating her for any awards, but it's. . . Yeah. I think that when you look at. . . We're talking about the obstetrical care that somebody needs. And I think when you look at the Illinois case law, and specifically the Michigan Avenue case, that it's clear that, number one, under Illinois law, there's no evidence of willful and wanton conduct on the part of. . . They were trying over those 10 days to do things. And secondly, under 6105 and 6106, which is their afforded immunity for failing to examine and failing to diagnose. If you look at the plaintiff's complaint in an appeal. . . But we're dealing with the problem. You know, there's no claim here about failure to diagnose. That's not the claim. I think if you read. . . There is, Your Honor. I think that in the appellant's brief. . . She's pregnant. She needs obstetrical care. Yeah, but she had no particular issue with her pregnancy, even based on her own testimony. So what we have is we have a pregnant woman. But there's no. . . It's unlike the American National Bank case where, in that case, the doctor failed to treat the female mother who was in a. . . It's called a transverse lie position, a breech position. after she had been diagnosed with that condition and there was prescribed treatment for that condition. That's not what we have here. The placenta abruption happened at the hospital that morning, and all the experts are in agreement it was an acute event and it happened at the hospital. Oh, it certainly did because she and the baby both would have been dead if it had happened elsewhere. And so it's sheer speculation to say that if she had gone to see an obstetrician there would have been any different result. And, in fact, if you review Dr. . . . Well, the different result would have been a C-section a couple of days before, which would have averted the whole thing. Even Dr. Gonzalez, in his testimony, Your Honor, says that he can't say that. And he says because, one, if she had been taken to an obstetrician, it is more likely than not the results of an ultrasound and the examination would have been normal. There would have been no evidence of any placental abruption. Her blood pressure was through the roof, though. Well, she had one reading. She was never, as this Court has noted in other decisions, one reading of a high blood pressure does not mean that she has . . . Well, there was a second reading, though. The second reading at the hospital was a 180 over 120. That was after she's already at the hospital. What I'm saying, it was never diagnosed by the Kankakee County people that she had hypertension. They tried to see her on the 18th, and if Mr. Menard had got a chance to take the blood pressure reading again and it was high again, he would have done something. All right, thank you very much. Thank you, Your Honor. Mr. Schoen. Thank you, Your Honor. Addressing the question about as far as what would have occurred had she been seen by an obstetrician, an obstetrician following standard obstetrical practice would have examined her. He would have determined that she had had a C-section. He would have taken a history. He would have determined that she delivered her prior pregnancy at 34 weeks. For her, her last pregnancy, she was at term at 34 weeks, not 38 when they got an obstetrician to agree to see her, but 34. But what do you do with someone who's so adamantly refusing care? There's one documented refusal of care, and that's a sick call on a specific day at a specific time. It's on September the 18th, and that's the only care that she refused to attend sick call on that day. She had attended sick call two days earlier, and she wasn't refusing any. There's no other proof that she's. Two days earlier, she's denying that she's having early labor pains. She complained of labor pains. The complaint of labor pains is documented in the official record of the jail, and the person that she saw, Nurse Sanxter, has testified that even if I think that there are false labor pains, I have an obligation to transfer her under the standard of care immediately to the hospital to an OB so an OB can make a determination on whether the contractions are false or whether they're not false. No one ever took any action on that. We don't delegate the decision to the patient. We don't delegate it to the nurse. The nurse can't make it. She has an obligation right then, game over, you take her in, and you have her seen by the OB. I'd like to talk about Menard for just a second, though. Counsel has said that Menard, Mr. Menard, made a record of this meeting. What Mr. Menard made a record of is he made a record that she had refused to attend sick call. What he is saying now is I went to see her and I told her, I'm going to perform an obstetrical examination on you and you'd better be there for sick call so that I can do this. There's no record of any personal meeting. We will cop to the fact, we will admit to the fact that she refused to attend sick call on one day, but there is no record that he ever personally met with her and urged her to undergo an OB exam that he was not qualified to perform on her. The first time he made a record that I was going to perform an obstetrical exam on her was four years after this incident at his deposition. Judge Rovner brings out a good point. You need an OB, you take her to the hospital. Actually, this is not in a wasteland that this happened. If we were to drop a compass point and draw a diameter of 12 or 15 miles, there would be a lot of hospitals, each one with an obstetrical department within that circle. There were a lot of obstetricians that would have been qualified and accessible in order to provide this care. No one ever took her to the hospital. No one ever did anything to get obstetrical care for her until it was too late. And you don't wait until she has an emergency. This question about she wasn't having an emergency, the question for a finder of fact is, is it reasonable for these defendants with a pregnancy that's a high-risk pregnancy and late in gestation to wait until there's an emergency to try to get her seen by an obstetrician? It is not. If you wait, you're going to be delivering a dead child. You especially are if there's a risk of an abruption. And in this case, an abruption happened earlier by history. Thank you very much. All right, thank you very much. Thanks to all counsel. We will take the case under advisement.